IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02854-MJW

JIMMY CARPENTER,
MIKE ANTRAM, and
MARVIN MARTINEZ,

Plaintiffs,

v.

DIRECTV, LLC,

Defendant.

**OPINION AND ORDER**

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

This case is before the Court for all purposes pursuant to 28 U.S.C. § 636(c), upon the consent of the parties (Docket No. 13) and the Order of Reference entered by Chief Judge Marcia S. Krieger on December 29, 2014 (Docket No. 14). Defendant moves for summary judgment under Federal Rule of Civil Procedure 56(a) on the claims brought by Plaintiffs Antram and Martinez under the Fair Labor Standards Act ("FLSA").[1] (Docket No. 87). Plaintiffs Antram and Martinez filed a response (Docket No. 98) and Defendant filed a reply (Docket No. 103). In addition, on April 4, 2017, Plaintiffs filed a Notice of Supplemental Authority (Docket No. 125) to which Defendant filed a response (Docket No. 129)[2]. The Court has reviewed the parties' filings, taken judicial notice of

---

[1] Plaintiff Carpenter's claims are being arbitrated.
[2] To the extent Defendant argues that information provided in the Final Pretrial Order should be "rejected," such an argument is inappropriate as submitted. Before the Court is a motion for summary judgment; that is all that is addressed herein. D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document.").

1

the Court's entire file in this case, and considered the applicable Federal Rules of Civil Procedure, statutes, and case law.

Now being fully informed, the Court makes the following findings and order.

## **Summary Judgment Standard**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal quotation marks omitted). The Court views the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008).

## **Facts**

The following facts are undisputed or uncontroverted, except where noted otherwise.

DirecTV sells and provides digital television and audio programming via satellite. Over 75% of DirecTV's revenues come from sales of goods and services to end users, meaning more than 75% of DirecTV's revenue is derived from the sales of goods and services that are not for resale. (Docket No. 87 at 3, Docket No. 98 at 6).

After a customer signs up for DirecTV service, technicians, such as the Plaintiffs in this case, install the receiving equipment in the customer's home or business. The receiving equipment consists of a small receiving satellite dish antenna, one or more digital set-top receivers that are usually leased to the subscriber, and remote controls. A customer must first purchase DirecTV service before a technician receives a work order to install the DirecTV system.[3] (Docket No. 87 at 3-4).

DirecTV contracts with Home Service Providers ("HSPs") to perform work orders for installations and service. (Docket No. 87 at 4, Docket No. 98 at 6). Plaintiff Martinez was engaged by an HSP to perform DIRECTV work orders from approximately August 2009 to May 2011. Plaintiff Antram was engaged by two different HSPs to perform DIRECTV work orders from approximately July 2012 to September 2012, and December 2013 to November 2014. (Docket No. 87 at 4, Docket No. 98 at 6).

DirecTV's relationships with the HSPs are governed by a Home Service Provider Agreement and any amendments. The HSP Agreements are drafted by DirecTV and, apart from minor differences, are essentially the same in form and content. (*See generally* Docket No. 97-2). The Agreements provide that:

> Contractor is an independent contractor authorized during the term hereof to perform and provide Services to DIRECTV. Except as otherwise expressly provided herein, Contractor shall have full control over the methods, techniques, sequences, and procedures of the Services to be provided hereunder. This Agreement is intended to create an independent contractor relationship between the parties for purposes of federal, state and local law, including the Internal Revenue Code of 1986, as amended. . . . Because Contractor and Contractor's employees and subcontractors are not employees, franchisees, agents or otherwise of DIRECTV,

---
[3] Plaintiffs argue that "many of the work orders have nothing to do with the initial purchase of a subscription for broadcast services . . . ." (Docket No. 98 at 7). However, Plaintiffs ignore the fact that even if a technician is asked to fix an issue with a piece of equipment, the customer had to have signed-up for service in the first place or there would be no need for technical service. Accordingly, the Court finds this to not be a material factual dispute.

3

> Contractor and its employees and subcontractors are not entitled to any benefits to which DIRECTV employees may be entitled under DIRECTV policies or as otherwise required by law, including workers' compensation or unemployment compensation benefits.

(*See, e.g.*, Docket No. 97-2 at 10 ¶ 19).

To be eligible for hire, DirecTV requires that HSP technicians complete Satellite Broadcasting and Communications Association ("SBCA") Certified Installer Training or another DirecTV-approved training program; complete a criminal background check; undergo a drug test administered by a DirecTV approved vendor; receive a "negative" result on the drug test; undergo a DMV record review; and have their Social Security number verified by the HSP. (*See, e.g.*, Docket No. 97-2 at 25 ¶ A). Per the Agreement, DirecTV, not the HSP, "in its sole discretion and upon notice to the [HSP]. May terminate the subcontractor status of any such third party or subcontractor and [the HSP] may not engage or otherwise utilize such third party or subcontractor in the performance of Services . . . unless and until DirecTV, in writing, reinstates such third party or subcontractor as a subcontractor, if ever." (*See, e.g.*, Docket No. 97-2 at 26 ¶ B).

DirecTV requires HSP technicians to display a badge identifying themselves as authorized DirecTV installers and wear the approved DirecTV shirt and cap. These items must be purchased from DirecTV at DirecTV's published prices. There is a provision allowing an HSP to purchase shirts with the DirecTV logo from a third party vendor, but all such items must be approved by DirecTV. (*See, e.g.*, Docket No. 97-2 at 26-27 ¶¶ C, E). In addition, all technicians are required to "be clean, well groomed and presentable" when providing service to a DirecTV customer. (*See, e.g.*, Docket No. 97-2 at 27 ¶ F). DirecTV further requires that work orders performed be carried out by

4

technicians driving vehicles meeting DirecTV's standards: new or like-new, damage-free, OSHA-compliant, vans or trucks. DirecTV logos may be displayed on all vehicles operating under the authority of an HSP Agreement as well as the HSP contractor's name and phone number as a service provider for DirecTV. (*See, e.g.*, Docket No. 97-2 at 27 ¶ D).

DirecTV's scheduling and work order management system is known as Siebel. (Docket No. 87 at 7, Docket No. 98 at 6). When a sale of a DirecTV system is made, a work order is created in Siebel. (*Id.*) Customers are booked into an appointment window based on their desired time slot. (*Id.*) DirecTV's optimization software then preliminarily books the customer's work order to a specific technician identification number, which could be assigned to either a DirecTV technician or a technician engaged by an HSP. (*Id.*) The Siebel database contains the names of every technician who installs or services DirecTV satellite equipment and their unique "Tech ID Number," skill qualifications, technical training certification status, designated service region, and availability to receive work orders. (Docket No. 87 at 8, Docket No. 98 at 6, 10-11). Siebel matches work orders to technicians based on a "technician profile," which the installation company has provided to DirecTV. That profile consists of the "three S's": (1) the technician's start and stop location (this does not have to be the technician's home address and in many instances it is not; this criterion is also sometimes referred to as "Service Area"); (2) schedule (the days and times the technician is reported as available to work); and (3) skill set (information on certifications or specialized skill set). (Docket No. 87 at 8, Docket No. 98 at 10).

HSPs are required to "outfit all employee technicians with a laptop computer or other approved web-based, handheld device capable of receiving, modifying and closing Work Orders in the field by such employee technician." (*See, e.g.*, Docket No. 97-2 at 3 ¶ 2.a.(i)). HSPs are also required to ensure that each technician has the ability to communicate, via cell phone, with both the HSP's dispatch office as well as DirecTV call center representatives while performing services. (*See, e.g.*, Docket No. 97-2 at 3 ¶ 2.a.(i)). Technicians have to "status" themselves by notifying DirecTV of their arrival on site at a customer's location. (Docket No. 87 at 8, Docket No. 98 at 6). With regard to scheduling, the Agreements require HSPs to have technicians available seven days a week for morning and afternoon appointments. (*See, e.g.*, Docket No. 97-2 at 31 ¶ e.(i)). The parties dispute how reassignments were handled. The parties also dispute how much freedom each technician has with regard to his day-to-day schedule.

## Discussion

On March 10, 2017, the parties stipulated to the dismissal of all state law claims brought by Plaintiffs Antram and Martinez. Following this Court's March 13, 2017 Minute Order (Docket No. 117), the only remaining claim brought by Plaintiffs Antram and Martinez in this case is Count I, which alleges that Defendant violated the FLSA "by failing to pay all minimum wage and overtime wages due to Plaintiffs, failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed, and improperly deducting money from Plaintiffs' pay." (Docket No. 1 ¶ 95). Similar claims have been brought in other courts across the nation. In short, Plaintiffs perform work for HSPs with which Defendant contracts. Plaintiffs maintain that Defendant controls the HSPs through the contracts that govern their relationship, and that, as a

6

result, Defendant is their employer for purposes of the FLSA. Plaintiffs also allege that the piece rate pay system used throughout Defendant's provider network fails to compensate them for "all necessary work they perform[ed]" (Docket No. 1 ¶ 55).

In the instant motion, Defendant argues that it is entitled to summary judgment for three alternative reasons. First, Defendant maintains that Plaintiffs Antram and Martinez were independent contractors, not employees, and therefore, the FLSA does not apply to the relationship. (Docket No. 87 at 25-41). Second, Defendant argues that with regard to the allegations that it failed to pay overtime, it did not have actual or constructive knowledge of uncompensated overtime Plaintiffs worked. (*Id.* at 42-43). Third, Defendant argues that with regard to the allegations that it failed to pay overtime, Plaintiffs Antram and Martinez are exempt from overtime pay under Section 207(i) of the FLSA. (*Id.* at 45-53).

**A.    Applicability of the FLSA**

The FLSA creates a cause of action against employers who violate the overtime compensation and/or minimum wage requirements mandated in the Act. An "employer" subject to the FLSA is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). An "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The FLSA "defines the verb 'employ' expansively to mean, 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)). Under the FLSA, two or more employers may employ a person jointly, and each joint employer is individually responsible for complying with the FLSA with respect to the entire

7

employment. 29 C.F.R. § 791.2. The relevant Department of Labor regulations list the following as examples of situations in which joint employment exists:

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees;
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* at § 791.2(b) (footnotes omitted).

Because the existence of an employer-employee relationship is a prerequisite to an FLSA claim, 29 U.S.C. §§ 201-219, a threshold question in this case is whether Defendant is a joint employer, with the HSPs, of Plaintiffs Antram and Martinez. Whether an entity is an employer within the meaning of the FLSA is a legal question, with subsidiary findings considered issues of fact. *Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 WL 4512327, at *9 (D. Colo. July 27, 2015) (citing *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986)). As noted above, this issue has been litigated in other courts across the country. A recent decision by Judge Ross in the Eastern District of Missouri summarizes many of those cases. *See Arnold v. DirecTV, LLC*, No. 10-cv-00352-JAR, 2017 WL 1250975, at *6-8 (E.D. Mo. Mar. 31, 2017). As he noted, this is a fact-intensive individualized inquiry and, as a result, courts have reached different conclusions depending on the circumstances of the individual plaintiffs.

The Tenth Circuit has not yet articulated a test for determining whether two entities are joint employers under the FLSA. *See Zachary v. Rescare Okla., Inc.*, 471 F.

8

Supp. 2d 1175, 1178 (N.D. Okla. 2006). However, the Tenth Circuit has adopted the "economic realities" test in analogous situations to determine whether a particular defendant acted as an "employer" as defined by the FLSA. *See Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (applying the economic realities test to determine whether plaintiffs were employees or independent contractors); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 570 (10th Cir. 1994) (same). Additionally, district courts within the Tenth Circuit, including Colorado, have applied the economic realities test at both the motion to dismiss and summary judgment stage to consider whether two entities qualify as "joint employers." *See Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1079 & n.15 (D. Colo. 2016); *Sanchez v. Simply Right, Inc.*, No. 15-cv-00974-RM-MEH, 2017 WL 749071, at *8-10 (D. Colo. Feb. 27, 2017). The weight of this authority guides this Court to apply the economic realities test to determine whether Defendant is a joint employer of Plaintiffs Antram and Martinez for the purposes of the FLSA.

Under the economic realities test, "the inquiry is not limited to traditional common law concepts of employee . . . or contractual terminology." *Harbert*, 173 F. Supp. 2d at 1105 (quoting *Henderson*, 41 F.3d at 570) (internal quotations omitted). The Court considers the following factors in determining whether Defendant is a joint employer under the FLSA: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. *See Coldwell v. Ritecorp Envtl. Prop. Sol.*, No. 16-cv-

01998-NYW, 2017 WL 1737715, at *5-6 (D. Colo. May 4, 2017) (applying the factors listed in *Baker v. Flint Engin. & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)); *but see Sanchez v. Simply Right, Inc.*, No. 15-cv-00974-RM-MEH, 2017 WL 749071, at *10 (D. Colo. Feb. 27, 2017) (distinguishing which factors are truly relevant when the potential employee is an independent contractor). "[N]o one of these factors in isolation is dispositive; rather, the test is based upon a totality of the circumstances." *Dole v. Snell*, 875 F.2d 802, 805 (10th Cir. 1989).

As an initial matter, Defendant argues that the Court cannot consider whether it is a joint employer with the HSPs unless the Court first determines that Plaintiffs Antram and Martinez are employees of the HSPs, not independent contractors. The Court acknowledges this, but also notes that the *Baker* test outlined above is the same test that is applied to this analysis. In addition, because the Court concludes that there are material disputed factual issues regarding both inquiries that must be decided by a jury, it will not waste the parties' and its own time engaging in this analysis at any length. As explained above, the parties generally agree on some of the key factual issues in this case. However, this Court finds, as Judge Ross found in *Arnold v. DirecTV, LLC*, that

> [c]areful consideration of the facts presented in the parties' motions reveals substantial factual disputes and contested inferences that preclude summary judgment on the parties' employment relationship. Although both sides argue the undisputed facts support their respective positions, they go to great lengths, in voluminous filings, to dispute the other's factual statements, and plainly disagree over which facts and inferences are significant [to the Court's analysis]."

2017 WL 1250975, at *8. The Court will not go into great detail here, but will note briefly a few disputed factual issues that prohibit the Court from determining the employment relationship of the parties.

Plaintiff Antram's and Plaintiff Martinez's relationships with the HSPs is not as thoroughly developed by Plaintiffs as it could be. In part, this is likely because they focus their arguments on whether Defendant is a joint employer, not whether the HSPs are employers under the FLSA. It seems that Plaintiffs assume that they were employees of the HSPs under the FLSA. Many facts tend to support this position. For example, under the *Baker* test, it is clear that the HSPs doled work out to the technicians who performed the needed work. The technicians also seemed to be reliant on the income from these jobs. However, it is also clear that the technicians had some amount of control over how much work they took on, which, in turn, impacted their profits from the work. Of course, underscoring all of this is the fact that at least one Plaintiff signed a contract to work as an independent contractor with one of the HSPs and both Plaintiffs appear to have filed taxes indicated that they were working as independent contractors at least at some point. (Docket No. 87-13, 87-14, 89-5, 89-6). However, the record contains only one unsigned example independent contractor contract for HSP Wireless Technologies, LLC (Docket No. 87-16) and one signed Independent Contractor Agreement between Infinity Satellite Corp. and Plaintiff Martinez (Docket No. 89-5). Further, in his interrogatory responses, Plaintiff Martinez states that he was "misclassified" as a 1099 employee when working at both of the HSPs for which he performed DirecTV-related work. (Docket No. 87-14 at 3). Similarly, Plaintiff Antram stated in his interrogatory responses that he received a W2 when he worked at one HSP and that he was "misclassified and received a 1099" when he worked at a different HSP. (Docket No. 87-19 at 3). These facts do not allow the Court

to reach a conclusion on the question of whether Plaintiffs Antram and Martinez were employees of the HSPs under the FLSA.

Similarly, assuming the Court could reach such a conclusion, the Court still could not answer the question of Defendant's relationship with Plaintiffs Antram and Martinez. First, with regard to the degree of control Defendant exercised over the technicians, it is undisputed that Defendant, at its own election, could terminate the subcontractor status of any technician simply by giving notice to the HSP. That indicates a fairly high level of control over hiring and firing of the technicians. However, this coupled with the training requirements could support Defendant's position that it was simply a quality control issue, not a management decision. Further, on a day-to-day basis, it is disputed how much control each technician had over their schedules. One owner of an HSP testified that he did have discretion to reassign work orders to other technicians, but he did not have access to Siebel himself. Instead, to make such a change, he had to email a DirecTV employee and ask that person to change the work order assignment to a different technician. (Docket No. 99-5 at 49:16-50:9, 105:13-17). In addition, Defendant had no information or involvement with the pay agreements between the HSPs and their technicians.

With regard to the technicians' opportunity for profit or loss, it is undisputed that each technician was paid for each type of job he performed. (Docket No. 87 at 11-12, 14, 18-19, Docket No. 98 at 6). However, as Plaintiffs point out, DirecTV could in its sole discretion cease to assign them work, which would, obviously, impact their ability to profit. (Docket No. 98 at 45-46).

For these reasons, the Court denies Defendant's motion for summary judgment (Docket No. 87) to the extent that it argues about the applicability of the FLSA to Plaintiffs Antram and Martinez.

## B. FLSA Exemption for Retail or Service Establishment

As noted above, Defendant also argues that it is entitled to summary judgment on Plaintiffs' claims that it failed to pay them overtime because the exemption found in 29 U.S.C. § 207(i) applies. The statutory elements of this exemption are:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). Applying an exemption "is a mixed question of law and fact." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010), *cert. denied*, ___ U.S. ___, 132 S.Ct. 368 (2011). "'The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

As the alleged employer, Defendant bears the burden of proving the exemption by a preponderance of evidence. *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157-58 (10th Cir. 2012). The employer must prove "both the nature of the establishment it operates and the applicability of an FLSA exemption." *Chessin v. Keystone Resort Management, Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999) (internal

quotation marks and citation omitted). "Exemptions under the FLSA are to be narrowly construed against the employers seeking to assert them." *Lederman*, 685 F.3d at 1157. (internal quotation marks and citations omitted). "The inquiry into exempt status . . . remains intensely fact bound and case specific." *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008) (internal quotation marks and citations omitted). Here, Defendant must prove three elements: Plaintiffs received a regular pay rate exceeding one and one-half times the minimum wage, Defendant is a retail or service establishment, and Plaintiffs received more than half of their compensation from commissions during the representative period. *Charlot v. Ecolab, Inc.*, 136 F.Supp.3d 433, 449, 2015 WL 5774984, at *14 (E.D.N.Y. Sept. 30, 2015); *Jones v. Tucker Communications, Inc.*, No. 5:11-cv-398 (MTT), 2013 WL 6072966 at *4 (M.D.Ga. Nov. 18, 2013), *appeal dismissed*, No. 13-15712 (11th Cir. Aug. 28, 2014).

The Court can quickly dispatch the second and third elements. The Court finds that Defendant is a retail or service establishment for the reasons stated in *Matrai v. DirecTV, LLC*, 168 F.Supp.3d 1347, 1358-63 (D. Kan. 2016). As in *Matrai*, Plaintiffs were paid per installation or other item, not for the amount of time they spent on each item. The Court concludes that for the reasons Judge Crow concluded that the plaintiffs were paid on a commission system, Plaintiffs in this case were also paid on a commission basis.

With regard to the first element---whether Plaintiffs' regular pay rate exceeded one and one-half times the minimum wage---I turn to Judge Strand's analysis in *Roader v. Directv, Inc.*, No. C14-4091-LTS, 2017 WL 151401, at *31-32 (N.D. Iowa Jan. 13, 2017). The plaintiffs in that case made the same arguments as Plaintiffs here. Namely,

14

that even though Plaintiffs provided "recalculated regular rates" of pay in their interrogatory responses, such amounts do not include any time for which they were not compensated. However, as Judge Strand notes, the case on which Plaintiffs rely is not applicable here because that court found that the calculated amount was for two weeks, which did not comply with 29 C.F.R. § 778.104. *Roeder*, 2017 WL 151401 at *31. As in *Roeder*, "the estimated pay rates here are calculated on a weekly basis." *Id.* at *32. Here, Plaintiff Martinez provided an interrogatory response stating that his "recalculated regular rate of" of pay was $25.00 per hour. (Docket No. 87-14 at 5). He calculated this based on a weekly compensation of $750 for 30 hours worked. He also stated that he "estimates that he received approximately one-to-two unlawful chargebacks of ranging in value from $50-$120 during each week of his employment." (*Id.*) Subtracting the high estimate of two $120 chargebacks from his weekly rate of $750, results in an hourly rate of $17.00 per hour. Plaintiff Antram estimates a regular rate of pay of $550 per week for 40 hours worked, or $13.75 per hour. (Docket No. 87-19 at 5). He states that he received "two-to-three unlawful chargebacks of $50-$75 . . . during each week of his employment." (*Id.*) Performing the same calculation results in a worst-case-scenario regular hourly rate of $10.00 ($550 − 75(3) = 325/40 = $8.13). It is undisputed that at all relevant times, the federal minimum wage was $7.25 per hour. *See* 29 U.S.C. § 206. Therefore, it is clear that Plaintiff Martinez's worst-case-scenario regular hourly rate of $17.00 per hour exceeds one and one-half times the minimum wage ($7.25(1.5) = $10.86). Therefore, the Court concludes that Defendant is entitled to summary judgment as to Plaintiff Martinez's claim for overtime pay under the FLSA. However, because Defendant has failed to prove this element as to Plaintiff Antram, the Court denies the

15

motion (Docket No. 87) to the extent it argues that it is entitled to summary judgment as to his claim for overtime pay under 29 U.S.C. § 207(i).

**C.    Knowledge**

Defendant also argues that it is entitled to summary judgment with regard to Plaintiff Antram's claim for overtime pay because Defendant lacked knowledge of Plaintiff Antram's overtime work. (Docket No. 87 at 42-45). As Defendant notes, "a plaintiff proceeding under § 207(a)(1) must also show that the employer had actual or constructive knowledge of the overtime." *McGrath v. Central Masonry Corp.*, 276 F.App'x 797, 799 (10th Cir. 2008) (citations omitted). "Thus, in order to withstand [a] motion for summary judgment on [an] FLSA claim, [the plaintiff is] required to show that a genuine issue of material fact exist[s] relative to whether [the defendant] knew or should have known of his overtime work, even though [the plaintiff] failed to report such work on his time sheets." *Id.* (citation omitted). Plaintiffs argue that this is really a question of damages which they are not required to prove at this time. (Docket No. 98 at 59-61). However, that is not correct. If there is no genuine issue of disputed fact that Defendant had no knowledge of Plaintiffs' working hours or any alleged unpaid overtime, it does not have to go before a jury on this claim.

Plaintiff Antram testified that on the one occasion he challenged a chargeback, he called Cam ("Mr. Camillo") whom he believed to be a DirecTV employee. Mr. Camillo referred Antram back to the HSP he was working for, Wireless, to resolve the issue. (Docket No. 87-8 at 38:9-40:20, 256:24-257:8). He also testified that he understood that DirecTV could have reimbursed Wireless for the chargeback that Antram reported to Mr. Camillo and that Wireless could have simply failed to reimburse Antram. (*Id.* at 258:2-

16

14). Further, Plaintiff Antram testified that when he believed Wireless was cheating him out of a bonus to which he was entitled based on high customer service scores, he went to the DirecTV office but was told he would need to deal with Wireless directly. (*Id.* at 180:13-181:3). He also testified that he believed that DirecTV did not have "any say one way or another" about whether Telecrafter (the other HSP he worked for) or Wireless paid him as a W-2 employee or a 1099 contractor. (*Id.* at 91:12-17). Plaintiff Antram also testified that has no evidence that DirecTV had any role with respect to how much or when he got paid for his work with Telecrafter or Wireless, other than to track customer satisfaction scores that Wireless used to determine whether he earned a monthly bonus. (*Id.* at 64:3-11, 85:14-86:18).

Plaintiffs offer some general statements about what the Siebel system does and does not track as to the work performed by any individual technician. However, this is insufficient to create a dispute about Plaintiff Antram's own testimony which makes clear that DirecTV had no knowledge or involvement with his compensation. If Defendant has no knowledge or involvement with his compensation, it cannot have had any knowledge of unpaid overtime. Accordingly, the Court concludes that Defendant is entitled to summary judgment as to Plaintiff Antram's overtime claim.

### Order

For the reasons set forth above, it is hereby ORDERED that Defendant's Motion for Summary Judgment on Claims of Plaintiffs Martinez and Antram (Docket No. 87) is GRANTED in part and DENIED in part. Summary judgment is granted with regard to Plaintiff Antram's and Plaintiff Martinez's overtime claims only. After trial on the

remaining issues, the Clerk of Court is directed to enter judgment in favor of Defendant and against Plaintiffs Antram and Martinez as to their overtime claims only.

Dated this 16th day of May, 2017.

BY THE COURT:

*/s/ Michael J. Watanabe*
MICHAEL J. WATANABE
United States Magistrate Judge